IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

IN RE INTEREST OF JAYDEN M.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF JAYDEN M., A CHILD UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

CHATAUNA M., APPELLANT.

Filed August 13, 2019.    No. A-18-414.

Appeal from the Separate Juvenile Court of Douglas County: DOUGLAS F. JOHNSON, Judge. Affirmed.

Jessica P. Douglas, of Schaefer Shapiro, L.L.P., for appellant.

Donald W. Kleine, Douglas County Attorney, Natalie Killion, and David M. Ceraso, Senior Certified Law Student, for appellee.

RIEDMANN, BISHOP, and WELCH, Judges.

BISHOP, Judge.

Chatauna M. appeals from the decision of the separate juvenile court of Douglas County terminating her parental rights to her son, Jayden M. We affirm.

BACKGROUND

PROCEDURAL BACKGROUND

Chatauna is the biological mother of Jayden (born 2015). William J. is Jayden's biological father. The State sought to terminate William's parental rights to Jayden during these same juvenile proceedings below. The record reflects that at the termination hearing, William expressed his

- 1 -

desire to relinquish his parental rights and the juvenile court held the matter in abeyance so that William could complete the relinquishment paperwork; our record does not reflect whether the relinquishment was thereafter completed. However, because William is not part of this appeal, he will not be discussed any further.

In October 2015, Jayden was removed from Chatauna's care due to concerns of her drug use and lack of adequate care for Jayden. The State filed a juvenile petition alleging that Jayden was a child within the meaning of Neb. Rev. Stat. § 43-247(3)(a) (Supp. 2015). The juvenile court granted the State's motion for temporary custody of Jayden and, other than briefly being placed with Chatauna for less than 2 months in 2016, he has remained out-of-home ever since. Jayden was placed with Amy J., the mother of his purported father at that time, Andrew J.; although Andrew was later determined not to be Jayden's biological father after paternity testing was completed, Jayden remained placed with Amy.

In January 2016, Jayden was adjudicated to be within the meaning of § 43-247(3)(a) based on Chatauna's admission to the allegation that her use of alcohol and/or controlled substances placed him at risk of harm. The matter proceeded to immediate disposition. In its January disposition order and its continued disposition order in March, the juvenile court ordered Chatauna to: participate fully in inpatient treatment at Santa Monica House and follow the recommendations upon her discharge; undergo random, frequent, observed drug testing; not possess or ingest alcohol and/or controlled substances unless prescribed by a licensed, practicing physician; participate in a gender specific sober support group such as Alcoholics Anonymous/Narcotics Anonymous (AA/NA), obtain and maintain a sponsor with a minimum of 5 years of sobriety, and provide proof of attendance to the Nebraska Department of Health and Human Services (DHHS); and participate in supervised family time/visitation with Jayden. She was also ordered to notify the court, all counsel in this matter, and DHHS of any change of address and phone number within 48 hours of said change.

Various "Impact from Infancy snapshot" and review and permanency hearings were held throughout this case. Chatauna's court-order requirements included that she: complete inpatient treatment at Santa Monica House and follow the recommendations upon her discharge; abide by the rules and expectations of Better Together (where Chatauna went after completing treatment at Santa Monica House) and follow the recommendations upon her discharge; participate fully in outpatient mental health and substance abuse treatment; begin her recommended Level II outpatient treatment; address her substance abuse through treatment as recommended by the chemical dependency evaluation; undergo drug testing; not possess or ingest alcohol and/or controlled substances unless prescribed by a physician; participate in a sober support group and have a sponsor; participate fully in family support services; obtain and maintain safe and stable housing to provide for herself and her child; obtain and maintain a legal source of income to provide for herself and her child; and participate in supervised visitation with Jayden.

The various orders following the "Impact from Infancy snapshot" and review and permanency hearings throughout this case also reflect that in April 2016, Chatauna's visitation was changed to semi-supervised, with the juvenile court stating that overnight family time/visitation could occur at the Santa Monica House. On August 9, the court ordered that Jayden be placed with Chatauna at Better Together (where she was residing) provided that she abided by

the rules and regulations of the Better Together Program and maintained her sobriety. On October 4, the court noted that Chatauna had a recent relapse but was making therapeutic progress. The court ordered that Jayden remain in the temporary custody of DHHS for continued appropriate care and placement, to include placement with Chatauna at Better Together, until further order of the court. Chatauna was ordered to participate fully in intensive outpatient treatment, not have any contact and/or communication with Andrew, not allow Andrew to have any contact with her son, and abide by the terms and conditions of a relapse prevention plan. The court also entered a temporary restraining order against Andrew ordering him to have no contact or communication whatsoever with Chatauna or Jayden pending further order of the court. On October 6, the court granted the State's ex parte motion for temporary custody of Jayden, and the court ordered that placement was to exclude the home of Chatauna (based on Chatauna's continued drug use, her unsuccessful discharge from Better Together, and the presence of Andrew in the residence despite the no-contact order). Jayden has remained in an out-of-home placement ever since, and Chatauna's visits went back to being supervised.

On August 29, 2017, the State filed a motion to terminate Chatauna's parental rights to Jayden pursuant to Neb. Rev. Stat. § 43-292(2), (6), and (7) (Reissue 2016). The State alleged that: Chatauna substantially and continuously or repeatedly neglected and refused to give the child, or a sibling, necessary care and protection; reasonable efforts to preserve and reunify the family had failed to correct the conditions leading to the adjudication of the child under § 43-247(3)(a); Jayden had been in an out-of-home placement for 15 or more of the most recent 22 months; and termination was in the child's best interests.

TERMINATION HEARING

The hearing on the motion to terminate Chatauna's parental rights was held on April 6, 2018. The State called several witnesses to testify, and numerous exhibits were also received into evidence. Chatauna testified on her own behalf. A summary of the relevant evidence follows.

According to court reports and case plans received into evidence, Chatauna previously had her parental rights terminated to another child (it appears termination occurred in 2011 or 2012); Chatauna's drug use was one of the issues in that case as well. Chatauna tested positive for marijuana and amphetamines when she was 34 weeks pregnant with Jayden. Jayden was born in 2015; he was removed from Chatauna that October (he was 7 months old at the time).

According to documentation received into evidence, Owens & Associates provided drug testing services to Chatauna from October 5 to December 31, 2015. During that time period, there were 15 attempts to test Chatauna, but she only completed testing 4 times (she tested negative for drugs and alcohol on those tests). Chatauna was discharged on December 31 due to incarceration.

The court reports and case plans received into evidence state that Chatauna was released from jail on February 1, 2016. She began inpatient substance abuse treatment at the Santa Monica House on February 2. Prior to entering treatment, her visits with Jayden were "extremely inconsistent" and "non existant [sic] for a portion of the time"; while in treatment she had consistent supervised visits with Jayden three times per week. After being discharged from Santa Monica House in July, Chatauna moved into Better Together for outpatient treatment. She was

making good progress and Jayden was placed with her there in August. However, in September she began missing classes and testing positive for alcohol and drugs.

Stephanie Sorum is a licensed independent mental health practitioner and a licensed drug and alcohol counselor. She provides mental health and substance abuse co-occurring treatment at Better Together, an "enhanced intensive outpatient facility." Sorum provided therapeutic services to Chatauna after Chatauna was admitted to the 2-year program on July 26, 2016. Chatauna "came into the program in outpatient level of care." She continued to use drugs and alcohol while in the program and she missed programming. Chatauna was then "authorized for a higher level of care," "intensive outpatient treatment," and was given "very specific expectations that she had to follow to remain in the program" (e.g. cannot use drugs or alcohol, must appear at all programming); Chatauna did not follow those expectations and was discharged 2 days later, on October 6. Jayden was removed from Chatauna that same day. During her time at Better Together, Chatauna tested positive for alcohol four times in September, and she tested positive for methamphetamines two times in October.

Owens & Associates provided drug testing services to Chatauna from February 11, 2016, to March 2017. During that time period, there were 124 attempts to test Chatauna, but she only tested 93 times; the other 37 times she either did not appear for testing or she was unable to provide a sample. Of the 93 times she completed testing, Chatauna tested presumptive positive for methamphetamine, marijuana, amphetamines and methylenedioxymethamphetamine on October 4, 2016; at the time of the October 4 test, Chatauna reported she last used all of those substances on September 30.

Kris Limbach is a supervisor with PromiseShip. PromiseShip provided family support and visitation services to Chatauna after she was unsuccessfully discharged from Better Together and Jayden was removed from her care in October 2016. The court reports and case plans received into evidence state that in January 2017, Chatauna was unsuccessfully discharged from family support because she was not working on goals with her support worker and she was not consistently meeting with the worker. According to Limbach, the initial parenting time referral in October 2016 was "3 times a week for 3 hours." Chatauna was consistent for the first 2 weeks and then started not showing up or ending sessions early. As a result, in November, she had to call and confirm visits in advance. In December, visits were reduced to two times a week because of inconsistent attendance. Chatauna was discharged in March 2017 due to incarceration. Prior to discharge, there had been discussion about increasing Chatauna's visits because "for the most part" she had been attending and participating in visits. Owens & Associates also discharged Chatauna from drug testing services after she was incarcerated in March.

The court reports and case plans state that Chatauna was released from jail at the end of April 2017, at which time she went to the Sienna Francis House "for long-term inpatient treatment." Chatauna was unsuccessfully discharged from the Sienna Francis House on September 7 due to noncompliant behaviors, as well as reports that she had been altering drug screens, missing curfew, and had drug related messages on her cell phone. Between May and August, Chatauna completed 31 out of 37 drug tests, all of which were negative; however staff at Sienna Francis House believed Chatauna had "altered drug screens" by using baking soda, diapers, and cotton balls. In October, Chatauna completed a co-occurring mental health and substance abuse

evaluation through Capstone Behavioral Health with therapist David Yoble; based on that evaluation, it was recommended that Chatauna complete Level 1 dual diagnosis outpatient treatment, and Level 2.1 dual diagnosis intensive outpatient treatment if she tested positive for drugs and alcohol while in Level 1 treatment. On January 12, 2018, Chatauna reported that she was in outpatient treatment with Yoble; but Yoble reported that Chatauna had only completed an evaluation and was not currently enrolled in treatment.

Owens & Associates' documentation shows that they provided drug testing services to Chatauna from May 6, 2017, to February 29, 2018. During that time period, there were 79 attempts to test Chatauna, but she only tested 48 times; the other 31 times she either did not appear for testing or she was unable to provide a sample. Of the 48 times she completed testing, Chatauna tested presumptive positive for methamphetamine on December 5, 2017 (admitted she used the day before), December 27, and on February 28, 2018; on each of those three occasions, Chatauna poured her sample out so that it could not be sent to the lab for confirmation. The record reflects that Chatauna was discharged from services on February 29 for failure to follow procedure. Capstone Behavior Health took over drug testing services for Chatauna on March 21. According to documentation received into evidence, there were three attempts to drug test Chatauna from March 21 to 28; two tests were missed and one was refused. Chatauna was also drug tested on April 2, and the results were presumptive positive for "M-AMP."

April Ramsey is a family and permanency specialist with Nebraska Families Collaborative. Ramsey became Jayden's caseworker in August 2017, and she remained his caseworker at the time of the termination hearing. Ramsey confirmed that when she took over this case, she "staffed the case" with the previous case worker, reviewed the previous court reports and case plans, familiarized herself with court orders and Chatauna's compliance with services, and spoke with Jayden's foster parent. Since August, Chatauna attended five out of the seven family team meetings. Chatauna testified that she had a "doctor's note" for missing two of the family team meetings. It was Ramsey's understanding at the time of the termination hearing that Chatauna did not have safe, stable, or appropriate housing, although she acknowledged that Chatauna informed her that she was on a wait list for housing. It was also Ramsey's understanding that Chatauna did not have a legal source of income. Ramsey stated that Chatauna had not completed a drug treatment program, noting that in January 2018, Chatauna reported that she was in treatment with Yoble, but when Ramsey spoke with Yoble, he stated that Chatauna was not in treatment. On cross-examination, Ramsey acknowledged that Chatauna completed treatment at Santa Monica House. Ramsey also acknowledged that Chatauna was participating in therapeutic services at Bailey's Counseling in March 2017. Chatauna was at a supervised visitation level during Ramsey's time on this case. Ramsey opined that it was in Jayden's best interests that Chatauna's parental rights be terminated so that permanency could be provided through adoption.

Chatauna testified that she is addicted to "[m]eth." To address her addiction, Chatauna went to Santa Monica's on February 1, 2016, and successfully completed the 6 month program. In July, she went to Better Together. Throughout the case she was drug tested, and "for the most part [she] was there," but "there have been times [she] didn't show up." Chatauna stated that she had "more negative than positive" UAs. She also stated there had "been a lot of periods" of continuous sobriety while this case has been ongoing. She said:

When I was in Santa Monica I was nine months sober before I relapsed, and then I was seven months sober again, and I had another dirty UA in December [2017], and then from December until just recently which would be three or four . . . months, but it's hard when, like, you're not getting no incentive in your visits. I've been doing supervised for a whole year.

To maintain her sobriety, Chatauna was going to Bailey's Counseling three times a week, and "also just praying." The person she was seeing at Bailey's Counseling was helping her with her addiction issues and to "work through some trauma issues." Chatauna said she has "PTSD" from being molested when she was younger, and also has bipolar disorder type 2. On cross-examination, Chatauna testified that the last time she used "meth" was on April 2, 2018 (4 days before the termination hearing).

Chatauna acknowledged that over the course of this case there had been periods of time that she had been incarcerated. She said she was incarcerated for 55 days "the first time" and 33 days "the second time"; she acknowledged that the incarcerations were for separate shoplifting offenses.

Chatauna testified that she had been living with her godparents for "the past two weeks" (prior to the termination hearing) because her time at a domestic violence shelter had "lapsed"; she was at the shelter for 45 days, and prior to that she stayed with a cousin for 3 months. She stated she had been a "temp employee" at Express Employment, a staffing agency, for about 6 months, "but it's not steady." She also got a job through WASI in March 2018, but did not stay there and was going to try to continue on with school. Ramsey testified that she called Express "a couple months back" and verified that Chatauna was not employed there; further a month prior to the termination hearing, Chatauna stated she was not employed and she was going back to school.

Chatauna stated her visits with Jayden "go really good." She goes to her visitations as scheduled, but had recently missed two or three visits. On cross-examination, she was asked if she frequently missed visits prior to January 2018. Chatauna responded, "I wouldn't say frequently, but I missed more than I feel like I should." The court reports and case plans reflect that Chatauna attended 56 out of 63 visits with Jayden from May to September 2017, and she attended 19 out of 40 visits from October through December. When asked what she would need to do if the court gave her more time to work towards reunification, Chatauna stated that she thought she needed to "go through another treatment session, perhaps a 30 day one . . . just to . . . rejuvenate [her] skills" and that she "just need[ed] to realize what a gift [Jayden] is."

JUVENILE COURT'S DECISION

In an order filed on April 9, 2018, the juvenile court terminated Chatauna's parental rights to Jayden after finding that statutory grounds for termination existed pursuant to § 43-292(2), (6), and (7), and that termination of her parental rights was in the child's best interests.

Chatauna appeals the juvenile court's order.

## ASSIGNMENTS OF ERROR

Chatauna assigns, restated, that the juvenile court erred in finding that (1) statutory grounds existed to terminate her parental rights and (2) termination of her parental rights was in the child's best interests.

## STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches a conclusion independently of the juvenile court's findings. *In re Interest of Isabel P. et al.*, 293 Neb. 62, 875 N.W.2d 848 (2016).

## ANALYSIS

### STATUTORY GROUNDS FOR TERMINATION

In Nebraska statutes, the bases for termination of parental rights are codified in § 43-292. Section 43-292 provides 11 separate conditions, any one of which can serve as the basis for the termination of parental rights when coupled with evidence that termination is in the best interests of the child. *In re Interest of Elizabeth S.*, 282 Neb. 1015, 809 N.W.2d 495 (2012).

In its order terminating Chatauna's parental rights to Jayden, the juvenile court found that statutory grounds existed pursuant to § 43-292(2) (substantial and continuous or repeated neglect), § 43-292(6) (having determined child was juvenile as described in § 43-247(3)(a), reasonable efforts to preserve and reunify family had failed to correct conditions leading to determination); and § 43-292(7) (child out-of-home for 15 or more months of most recent 22 months).

Jayden was in an out-of-home placement from October 2015 to August 2016, and then continuously since October 6, 2016. At the time the motion to terminate Chatauna's parental rights was filed on August 29, 2017, Jayden had been in an out-of-home placement for a total of 20 months. And at the time of the termination hearing on April 6, 2018, he had been in an out-of-home placement for a total of 28 months. Our de novo review of the record clearly and convincingly shows that grounds for termination of Chatauna's parental rights under § 43-292(7) were proven by sufficient evidence.

We need not consider whether termination of Chatauna's parental rights was proper pursuant to § 43-292(2) or (6), since any one ground of the 11 identified in § 43-292 can serve as the basis for the termination of parental rights when coupled with evidence that termination is in the best interests of the child. See *In re Interest of Elizabeth S., supra*.

We note that Chatauna asserts that the she was not "offered reasonable efforts" in this case. Brief for appellant at 16. However, because we do not consider whether termination of Chatauna's parental rights was proper pursuant to § 43-292(6), Neb. Rev. Stat. § 43-283.01 (Reissue 2016), which requires reasonable efforts to reunify families, is not applicable to the instant case. See *In re Interest of Andrew M. et al.*, 11 Neb. App. 80, 643 N.W.2d 401 (2002). Section 43-283.01 is only incorporated into § 43-292(6), not into the remaining subsections of § 43-292. *In re Interest of Andrew M. et al., supra*.

Thus, the next inquiry is whether termination of Chatauna's parental rights is in the child's best interests.

BEST INTERESTS AND UNFITNESS

Under § 43-292, once the State shows that statutory grounds for termination of parental rights exist, the State must then show that termination is in the best interests of the child. *In re Interest of Ryder J.*, 283 Neb. 318, 809 N.W.2d 255 (2012). But that is not all. A parent's right to raise his or her child is constitutionally protected; so before a court may terminate parental rights, the State must also show that the parent is unfit. *In re Interest of Nichole M.*, 287 Neb. 685, 844 N.W.2d 65 (2014).

There is a rebuttable presumption that the best interests of a child are served by having a relationship with his or her parent. *Id*. Based on the idea that fit parents act in the best interests of their children, this presumption is overcome only when the State has proved that a parent is unfit. *Id*. The term "unfitness" is not expressly used in § 43-292, but the concept is generally encompassed by the fault and neglect subsections of that statute, and also through a determination of the children's best interests. *In re Interest of Nichole M., supra*. Parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which caused, or probably will result in, detriment to a child's wellbeing. *Id*. The best interests analysis and the parental fitness analysis are fact-intensive inquiries. *Id*. And while both are separate inquiries, each examines essentially the same underlying facts as the other. *Id*.

Initially we note that in her appellate brief, Chatauna puts a lot of focus on her domestic violence issues with Andrew, arguing that she was not given assistance to address the domestic violence, and that it was not appropriate to place Jayden with the mother of the abuser. Although the record before us does indicate domestic violence issues between Chatauna and Andrew, there is not great detail in the record. Further, the juvenile court entered a restraining order against Andrew ordering him to have no contact or communication whatsoever with Chatauna or Jayden pending further order of the court. And while domestic violence issues are always concerning, the focus here is whether Chatauna's parental rights should be terminated.

Jayden was initially removed from Chatauna when he was 7 months old. At the time of the termination hearing, Jayden (then 3 years old) had been in an out-of-home placement for 28 out of the previous 30 months. During the pendency of this case, Chatauna had periods of progress, even getting placement of Jayden at one point in 2016. However, her overall progress in this case has been inconsistent. After her successful discharge from substance abuse treatment at Santa Monica's in July 2016, Chatauna enrolled in Better Together for outpatient treatment. But she was discharged from Better Together in October for noncompliance and continued drug use. In January 2017, Chatauna was discharged from family support services for noncompliance. In March, she was discharged from visitation services due to her incarceration. After her release from jail at the end of April, Chatauna went to the Sienna Francis House for inpatient treatment, but she was discharged in September for noncompliant behaviors; and although her drug tests had been negative while she was at the Sienna Francis House, there were concerns that she had been altering her drug screens. From September through December, Chatauna only participated in 13 out of 34 attempts to drug test her. Of the 13 times she completed testing, Chatauna tested presumptive positive for methamphetamine on December 5 (admitted she used on the day before) and on

December 27, and on both occasions Chatauna poured her sample out so that it could not be sent to the lab for confirmation. She tested presumptive positive for methamphetamine again on February 28, 2018, but once again poured her sample out so that it could not be sent to the lab for confirmation. Chatauna continued to miss or refuse drug tests, and on April 2, she tested presumptive positive for "M-AMP." At the termination hearing, Chatauna admitted to using "meth" on April 2 (just 4 days before the termination hearing).

In addition to her continued drug use, Chatauna had brief periods of incarceration, did not have stable housing, and at the time of the termination hearing her employment was in question. Furthermore, although Chatauna's visits with Jayden appeared to go well, her visits were inconsistent (e.g., she attended only 19 out of 40 visits from October through December 2017) and they remained supervised. There was evidence that Chatauna had a strong bond with Jayden. But having a bond with a child does not make a parent a fit person to provide parental care for him or her. See *In re Interest of Alec S.*, 294 Neb. 784, 884 N.W.2d 701 (2016).

Ramsey opined that it was in Jayden's best interests that Chatauna's parental rights be terminated so that permanency could be provided through adoption. We agree. Jayden deserves permanency and a safe and stable home. Although Chatauna should be commended for her periods of sobriety, unfortunately, her relapses and overall lack of progress and noncompliance has served as a barrier to reunification. "Children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity." *In re Interest of Walter W.*, 274 Neb. 859, 872, 744 N.W.2d 55, 65 (2008). Where a parent is unable or unwilling to rehabilitate himself or herself within a reasonable time, the best interests of the child require termination of the parental rights. *In re Interest of Ryder J., supra*. We find that the State has rebutted the presumption of parental fitness as to Chatauna. We further find that there is clear and convincing evidence that it is in Jayden's best interests to terminate Chatauna's parental rights.

### CONCLUSION

For the reasons stated above, we affirm the order of the juvenile court terminating Chatauna's parental rights to Jayden.

AFFIRMED.